# EXHIBIT 1

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

| | |
|---|---|
| JOSEPHINE SHUI, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | MORRIS COUNTY: CHANCERY DIVISION – GENERAL EQUITY PART |
| v. | DOCKET NO.: |
| LEI WANG, HENGCHUN "HELENA" FAN, MERYL L. UNGER, ESQ., THOMAS M. LOPEZ, ESQ., KATSKY KORINS LLP and JOHN DOES (1-10), | CIVIL ACTION |
| | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiff, JOSEPHINE SHUI, by way of Complaint against Defendants, LEI WANG, HENGCHUN "HELENA" FAN, MERYL L. UNGER, ESQ., THOMAS M. LOPEZ, ESQ., KATSKY KORINS LLP and JOHN DOES (1-10), by and through her attorneys Baron Samson LLP, says the following:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Jo Shui ('Shui') resides at 3 Herman Way, Towaco, New Jersey.

2.      Defendant Lei Wang ("Wang") resides at 21 Gurney Street, Cambridge, Massachusetts.

3.      Defendant Hengchun Fan ("Fan"), who goes by the name "Helena," resides at 421 Bridoon Terrace, Encinitas, California.

4.      Shui, Wang and Fan are the only members in The Lotus Group, LLC ("TLG"), a New Jersey limited liability company with a principal business address located at 330 Changebridge Road, Suite 101, Pine Brook, Morris County, New Jersey.

5.      Defendants Meryl L. Unger, Esq. ("Unger") and Thomas M. Lopez, Esq. ("Lopez") are attorneys employed by Defendant Katsky Korins LLP (the "KK Firm"), a law firm located at 605 Third Avenue, New York, New York 10158.  At all times relevant hereto, Unger and Lopez acted within the scope of their employment at the KK Firm, thereby rendering it vicariously liable for their conduct.  (Lopez, Unger and the KK Firm will collectively be referred to herein as the "KK Defendants.")  The KK Defendants purport to act as company counsel to TLG, but they have aided and abetted the wrongs alleged in this action on the part of Wang and Fan and/or have engaged in a conspiracy with Wang and Fan to commit the wrongs set forth herein.

6.      Defendants John Does (1-10) are individuals or entities whose identities may be unknown to Shui and who, upon information and belief, have aided and abetted the wrongs alleged in this action on the part of Wang and Fan and/or have engaged in a conspiracy with Wang and Fan to commit the wrongs set forth herein.

7.      Shui's claims in this action arise largely out of the management and operations of TLG and the contractual relations between the members in TLG, a New Jersey limited liability company with offices in New Jersey, as set forth in TLG's Operating Agreement.  The KK Defendants provided legal advice regarding the operations of TLG, a New Jersey limited liability company, which necessarily implicated New Jersey law (although neither Unger nor Lopez is licensed to practice law in New Jersey).  Wang and Fan own significant property located in New Jersey consisting, at least, of their respective membership interests in TLG.  Consequently, the courts of the State of New Jersey have jurisdiction over this action and the parties.

8.      Both Shui and TLG reside in Morris County, and the claims set forth herein arose in Morris County, making it an appropriate venue for this action.

2

## FACTS COMMON TO ALL COUNTS

9.     TLG is a boutique employment agency and recruiting firm specializing in the placement of temporary and permanent personnel in the biometrics field.  Such personnel include biostatisticians, statistical programmers and data managers.   TLG primarily serves the pharmaceutical industry.

10.     TLG was formed via filing with the Secretary of State of New Jersey on or about January 25, 2013.

11.     On or about May 1, 2013, Shui, Wang and Fan entered into the Operating Agreement for TLG (the "Operating Agreement").  Shui, Wang and Fan are, and have been, the only members in TLG.

12.     Pursuant to the Operating Agreement, ownership in TLG is allocated as follows: 51% to Wang, 37% to Shui and 12% to Fan.  Nearly every decision requiring a vote of the members is, according to the Operating Agreement, subject to a simple majority vote, meaning Wang wields essentially unlimited and unilateral power to determine the course of the company and every significant decision affecting its management and affairs.

13.     The Operating Agreement entitles every member to access to the books and records of the company which would include, without limitation, communications between members of TLG and company counsel.

14.     Article XV of the Operating Agreement, entitled "Withdrawal of Member by Sale or Transfer of Stock," specifically permits each member to sell or transfer her interest in TLG to a third party subject only to the other members' right of first refusal.  The same section further provides that "[s]hould any member be desirous of … withdrawing without a third party offer, the purchase price to the other members shall be as calculated per the provisions of Section XVI of"

the Operating Agreement (emphasis added). The same section further provides that "[p]ayment for the selling/withdrawing member's membership shall be made by the purchasing member in equal annual payments over a five year period without interest." (emphasis added)

15. Originally, Section XVI(d) of the Operating Agreement provided that "[t]he purchase price … shall be equal to the amount as listed in [the selling member's] Capital Account as referenced in the books and records of" TLG.

16. The Operating Agreement also incorporated resolutions and minutes of even date.

17. According to the Organizational Resolutions Adopted by the Members of TLG on May 1, 2013 and incorporated into the Operating Agreement, each member was to be a managing member entitled to an annual salary "Not to exceed $1,000,000." Despite this provision, the members, who expected that the administrative and operations tasks within the business would likely be minimal as TLG was a service business start-up, agreed, at the very beginning of the operation of TLG, to forego salaries. On one occasion, Wang, in a condescending and demeaning manner and tone, stated to Shui "Dear, you will never get a salary."

18. The members were also assigned operational responsibilities. Shui and Fan were to be involved in recruiting, and Wang was to be involved in client development. Shui and Wang were to share operations and management responsibilities, with Fan, who had elected to work part-time at the outset, to assume some of those responsibilities if she commenced working full-time. Again, the members agreed to forego salaries for these operations and management responsibilities, relying upon commissions and any distributions from the business as their sole sources of income from the business.

19. Although, according to the minutes incorporated into the Operating Agreement, the members were to share in management and operations responsibilities, a disproportionate share of

those responsibilities fell upon Shui.  Shui had ten years of experience in the field of human resources prior to the formation of TLG and was the sole native English-speaker among the three members.  For these reasons, Shui was tasked with reviewing contracts and handling a disproportionate share of the administrative and human resources tasks.  As a direct consequence, Shui was unable to devote the same portion of her time as the other members to commission-earning tasks.  The predictable result was that Shui financially benefited the least from her efforts in support of the business.

20.     This was especially true when the business took off at a surprising pace, and, as a direct result, the administrative and operations tasks mounted almost immediately.

21.     Shui was primarily responsible for developing and implementing TLG's infrastructure, human resources, training, securing health insurance and other employee benefits and choosing and setting up payroll systems and applicant tracking procedures.  Shui was also responsible for reviewing contracts and handling banking for the business.  Thus, Wang and Fan were able to focus their efforts on commission-earning tasks while Shui built and managed the administrative processes of the business through non commission-earning tasks.

22.     The business became profitable very quickly.  As a result, Wang and Fan began to earn substantial annual commissions, while Shui, to whom was relegated a disproportionate share of the operations and management work for which the company was still paying no salary, earned far less than Wang and Fan.

23.     Shui's efforts to persuade Wang, who effectively controlled the company by virtue of her majority membership interest, to agree to managerial salaries once the business had become profitable and demonstrated rapid growth and once it became apparent that Shui was going to be handling the majority of the administrative and operations tasks, were met with utter refusal.

Indeed, Wang informed Shui that she would never be paid any salary for all of her operations and management work.

24.     Furthermore, distributions from the business, which were withheld for a period of one or two years, were calculated so as to cover little more than the taxes the members would owe due to the business's taxable earnings each year.  During the first two to three years of operations, Shui and her husband were forced to borrow money to pay taxes she owed as a consequence of the undistributed earnings of the company.

25.     Thus, due to her willingness to perform a significant and disproportionate share of the non-commission-based work, Shui was far less compensated than Wang and Fan, whose work consisted mostly of commission-based work, such as recruiting and client development.  Shui's reasonable expectations upon entering into the Operating Agreement, to wit, that she would derive financial benefits from TLG's business success proportionate to her ownership stake and merited by her efforts in furtherance of that business, were frustrated due to the unfair and oppressive policies implemented and enforced by Wang, with Fan's cooperation and assent.

26.     On or about June 1, 2018, the Operating Agreement was amended via the First Amendment to Operating Agreement for TLG (the "First Amendment"), which was executed by all three members.

27.     The essence of the First Amendment was to replace the purchase price provided in Section XVI(d) with a process whereby the purchasing members would first obtain an appraisal, after which the selling member may obtain her own competing appraisal, and failing a substantial agreement among the two appraisers, the appraisers choose a third appraiser, whose appraisal would be determinative of the price.  The price is to "be based upon the total fair market value of [TLG], less any debt or other financial obligations."

28.     The First Amendment represented a compromise, as TLG had received advice of counsel to enter into a more detailed and thorough buy-sell agreement.  Counsel to TLG at the time (since replaced by Wang) had advised that TLG either obtain regular valuations or, at the very least, develop a formula for any buy-out of a member's interest by the other members that the members could agree upon in advance in order to simplify the buy-out process.  It was Wang who ultimately vetoed this idea, ignoring corporate counsel's prudent advice.

29.     Despite the clear language of the First Amendment, Wang has repeatedly over the years insisted in conversations and communications with Shui that any sale by one member to the others should be at some discounted value, betraying her premeditated intentions to lowball Shui in the event that the latter ever sought to exercise her withdrawal by buy-out rights.

30.     Over time, tensions developed between Shui and the other members over various human resources issues, including but not limited to Wang's decision to have applicants asked about their citizenship status in violation of law, discriminatory recruitment and compensation practices implemented by Wang, and TLG's handling of other human resources and employment matters in a potentially illegal manner.  By way of example, and not limitation, in one instance, Wang instructed recruiters to disregard applicants of a particular ethnicity for a particular job opening, a step that was not only extremely distasteful and ugly but also exposed TLG to potential liability.  Most recently, this tension has arisen yet again around Shui's reasonable inquiries into the handling of an employment-related matter.  These various human resources actions by Wang made Shui extremely uncomfortable, but, as a minority member, Shui was obviously powerless to stop them.

31.     In June of 2021, Shui suffered a serious health setback, which caused her to reevaluate her priorities and, in particular, the stress of dealing with Wang's authoritarian and often discriminatory approach to managing TLG.

32.     In or about July 2021, Wang unilaterally decided to replace TLG's company counsel, who had been representing and advising the company since its inception, with Unger of the KK Firm, with whom she had her own pre-existing personal relationship and friendship.  In retrospect, that move was clearly the first step in an orchestrated and coordinated plan to take advantage of Shui's health issues to force her to accept a lowball offer for her interest.

33.     The engagement letter, which was executed by Unger on behalf of the KK Firm and by Wang on behalf of TLG, specifically stated that the scope of the engagement was "to represent [TLG] in connection with a potential sale of its business…." at an hourly rate for Unger of $760.  Shui met Unger for the first time in a Zoom meeting in July 2021.  During that meeting, Shui asked Unger whether Unger, given her preexisting relationship with Wang, would be representing Wang or the company in the event of a sale or buyout of membership interests by other members.  Unger specifically responded that this was "an excellent question," and that separate representation of the members was standard and recommended.  Unger also advised that, in the event of such a sale or buyout, she would represent both the company and Wang, individually, pursuant to a separate retainer agreement.  Unger failed to disclose that dual representation under those circumstances would, in fact, be an unethical conflict of interest.

34.     In the summer of 2021, TLG also engaged a broker to assist the company in seeking a potential buyer.  The broker's efforts resulted in at least three preliminary offers which collectively established a significant fair market value on the company within a range that Wang and Fan have repeatedly failed to acknowledge since. In 2020, TLG had obtained an appraisal of

the business based on 2019 closing numbers (the "2019 Appraisal"), and the offers received in 2021 were nearly twice that figure due to the tremendous year-after-year growth in the company's revenues and profits. However, none of those offers resulted in a consummated deal, and at least one of the offers was retracted in part due to TLG's potential mischaracterization of employees as independent contractors. Wang exercised unilateral control over the entire process, including the choice of broker, and her decisions impaired TLG's ability to find a buyer and consummate a deal.

35.     While she did not resign or seek to withdraw from the company, in or about February 2022, Shui did approach Wang and Fan with a request that they develop a plan for her exit within the next year or so in the hopes of accomplishing an amicable withdrawal on a schedule that would not harm TLG.

36.     In response, Wang and Fan made an insultingly lowball offer to Shui for a majority of her interest in the company. Extrapolating from their offer, they had valued the entire company, in or about 2022, at around half of the value established by the 2019 Appraisal, despite the extraordinary growth and the much higher offers that TLG had received. Thus, the clear intent to utilize Wang's unilateral control over the business and to take advantage of Shui's health concerns to force Shui to accept a lowball buy-out was clearly exposed.

37.     On or about January 17, 2023, Shui notified Wang and Fan via a letter from counsel of Shui's intention to exercise the withdrawal-by-sale right contained in Article XV of the Operating Agreement.

38.     After a brief exchange between Unger and Shui's counsel, which included Unger requesting, and Shui's counsel providing, copies of the applicable agreements containing Ms. Shui's buyout rights, Unger advised Shui's counsel in writing, pursuant to Article XVI(d) of the First Amendment to the Operating Agreement, of the intention of the other members to commence

the appraisal process as described therein. Unger further advised that Ms. Wang and Ms. Fan would be engaging the appraiser and paying for the appraisal called for in the First Amendment to the Operating Agreement.

39.   Shui, in preparation for this process, engaged her own appraisal firm through counsel and requested some basic information from TLG's accountants to provide to such firm so that they could provide an appraisal of Shui's interest consistent with her buyout rights ("Shui's Appraisal").

40.   Shortly after Unger announced that the appraisal process set forth in the First Amendment to the Operating Agreement would commence, Wang and Fan, through their own joint personal counsel, completely reversed course and advised that, notwithstanding Unger's prior representations to the contrary, that they had no intention of honoring Shui's exercise of her withdrawal-by-sale right contained in Section XV of the Operating Agreement, as amended.

41.   Not long after personal counsel to Wang and Fan repudiated the agreement to commence the appraisal process, both personal counsel to Wang and Fan and the KK Defendants began accusing Shui of interfering with the business by her making inquiries about such topics as the proper handling of human resources matters and by her making requests for basic accounting information, which is both her right as a member and essential to her ability to exercise her withdrawal and buyout rights set forth in the Operating Agreement, consistent with Unger's prior representations.

42.   The KK Defendants also began using Shui's health concerns against her by interpreting her efforts to agree upon an appropriate buy-out for over a year and her exercise of her withdrawal by buy-out right as purported evidence that Shui had abandoned her role in the company and withdrawn unconditionally as a member, which was clearly not the case.

10

43.     Particularly troubling about the KK Defendants' decision to weigh in on the side of Wang in this intermember dispute was their abject failure to conduct any kind of investigation before accepting as true Wang's allegations of wrongdoing by Shui while utterly ignoring Shui's allegations of wrongdoing by Wang.  This would commence a disturbing pattern of TLG's so-called company counsel blindly taking Wang's side in this intermember dispute and conflating Wang's personal interests with those of TLG.

44.     For example, contemporaneously with the KK Defendants' and Wang's absurd allegations against Shui, Wang took steps to cut off Shui's access to bank records and ability to engage in banking activities essential to Shui's administrative and human resources work on behalf of TLG, and which Shui had handled since the inception of TLG.  The KK Defendants' response to Shui's counsel's objections to this action was, once again, to side with Wang over Shui without any apparent investigation whatsoever, simply accepting Wang's allegations as true and utterly ignoring Shui's allegations against Wang, including allegations of conduct clearly harmful to TLG. Remarkably, the KK Defendants utterly failed to even contact Shui to ascertain either her position as to Wang's unfounded allegations or her own allegations against Wang.

45.     Meanwhile, despite repeated demand, Shui has been frozen out of, and denied access to, any and all legal communications and advice provided to TLG by the KK Defendants over the past several years, notwithstanding Shui's undeniable right to such communications and advice as a manager-member of TLG.  This is particularly disturbing and outrageous considering the fact that Shui has effectively paid 37% of KK's legal fees over the course of that entire period.

46.     It has recently come to Shui's attention that Wang has caused TLG to abruptly cease efforts to sell TLG's business without any consultation with Shui.  This occurred despite the fact that ongoing conversations with one prospective purchaser had been underway and were put "on

hold." Upon information and belief, this decision was made unilaterally by Wang, perhaps with Fan's knowledge, but Shui was forced to learn about it after the fact via her own independent inquiries. Based upon communications between and among the parties, including specifically communications from the KK Defendants, and upon further information and belief, this was done in order to force Shui to accept an insultingly lowball offer from Wang and Fan before they turn around and sell the company (including the interest purchased at a low-ball price from Shui) for true fair market value.

47. Administrative staff of TLG have been directed by Wang to deny Shui basic information about the business that is necessary both to Shui's continued work on the company's behalf and to her efforts to evaluate and market her share in the business.

48. Wang, in collaboration with Fan and the KK Defendants, continues to make unilateral decisions that have significant potential to negatively impact the business and its value and to harm and oppress Shui personally. One example was Wang's unilateral decision to change TLG's employee health care plan, resulting in significantly greater cost to employees with no notice to Shui or to the employees, causing chaos and severe harm to employee morale. Wang compounded this error by paying select employees bonuses to cover their increased premiums but did so on an arbitrary and/or discriminatory basis. Again, this made Shui extremely uncomfortable, but, given her minority interest, she was powerless to veto or change.

49. More recently, upon Shui's engagement of counsel to enforce her withdrawal and buyout rights and said counsel's providing Wang's and Fan's personal counsel and the KK Defendants with Shui's Appraisal of her interest pursuant thereto, the KK Defendants have gone to extraordinarily lengths to protect Wang's personal interests to the detriment of Shui and to assist in Wang's and Fan's oppression of Shui.

50.     On March 17, 2023, Unger, via an email to Shui's attorneys, insisted that, despite Shui's clearly recognized right to seek third-party offers for her interest in TLG, "Jo has no authority to disclose (directly or indirectly) any company information to any third party."  No citation to any law or contractual provision was offered.  Aside from the legal inaccuracy of this statement, it was clearly intended to chill Shui's exercise of her right to seek a third-party purchaser for her interest.

51.     For example, on March 30, 2023, Lopez authored a letter to Shui's counsel which plainly illustrates the KK Defendants' absolute bias and failure to impartially represent TLG in this dispute among its members.  The letter begins with an assertion that Shui is accusing TLG of oppressing her, a characterization that ignores both the language of Shui's counsel's prior correspondence and the very nature of oppression, as described in N.J.S.A. §42:2C-48(a)(5)(b), which describes minority member oppression as the conduct of "those members in control of the company."

52.     That the mischaracterization of Shui's claims as claims against TLG, rather than against Wang and Fan, was not an inadvertent misstatement became clear when, later in the same letter, Lopez absurdly asserted that Shui "assumed a position adverse to" TLG when she engaged counsel in connection with her withdrawal and buyout rights.   This was then cited by Lopez as the transparent excuse for freezing Shui out of all of the KK Firm's communications and legal advice to the Company including flatly rejecting Shui's demand for copies of all of the KK Firm's communications and legal advice provided to TLG over the past several years, advice to which Shui is clearly entitled and for which she effectively paid 37% of all fees associated therewith. That the KK Defendants have intentionally conflated TLG's interests with Wang's personal

interests only underscores that they have ceased acting as company counsel, if indeed they ever had, and have chosen to act in all ways as though they were personal counsel to Wang.

53.     The KK Defendants' contention that Shui was somehow adverse to TLG simply as a consequence of her engaging counsel in connection with her withdrawal and buyout rights was manufactured in furtherance of the KK Defendants' ongoing campaign to assist Wang and Fan in their oppression of Shui under the guise of somehow protecting the Company.   In this regard, the KK Defendants, while hiding behind this bogus excuse, not only flatly refused Shui's request for the KK Firm's files relating to its legal advice given to TLG since Shui engaged counsel but, remarkably, this freezeout and refusal somehow even extended to legal advice given prior to the alleged (and utterly fictional) adversity between Shui and TLG.

54.     The fact that Shui's engagement of separate counsel in connection with her withdrawal and buyout rights did not create adversity with TLG was previously acknowledged by Unger multiple times, including in the aforementioned Zoom meeting in July 2021 during which she stated that engagement by members of separate counsel under such circumstances is standard and recommended.

55.     The fact that Shui's engagement of counsel in connection with her withdrawal and buyout rights did not create adversity with TLG has also been acknowledged by Wang and Fan multiple times over the past several years.  Indeed, Wang and Fan had always acknowledged that separate personal counsel would be warranted when it came time for either a sale of the company or a buyout of Shui's interests.  For example, on or about November 23, 2021, when discussing a potential sale of the company and the KK Firm's role, Fan advocated for separate counsel for the members, stating in an e-mail to Shui that "Meryl [Unger] is Lei [Wang's] friend.  I am not sure if she can represent all of us and be the middle person."  More recently, Shui has mentioned in

14

numerous emails to Wang and Fan the advisability of retaining separate counsel under the circumstances, to which Wang and Fan interposed no objection or opposition.

56. Lopez, in his letter of March 30, also improperly opined as to the merits of Shui's Appraisal prepared at Ms. Shui's expense pursuant to her withdrawal and buyout rights, going so far as to state his understanding that the appraisal is "deeply flawed" and sets forth a "grossly inflated valuation" of Shui's membership interests. In so doing, he once again once betrayed that the KK Defendants are acting not as company counsel but rather as Wang's personal counsel, advancing her interests to the detriment of Shui's. After all, pursuant to the Operating Agreement, the buy-out is between Wang and Fan, as purchasers, and Shui, as seller.

57. The fact that purported company counsel, who should be completely indifferent as to the valuation of one member's interest for purposes of a buyout of that interest by the other members, would take a position in support of Wang and Fan and to the detriment of Shui, is remarkable. Such obvious attempts by the KK Defendants to assist Wang and Fan in their attempt to lowball Shui in this purely intermember issue is even more outrageous considering that Shui is not only effectively paying 37% of KK's legal fees but is now being forced by Wang, as communicated by the KK Firm, to pay 37% for a competing valuation against her interests. Worse, Lopez is seemingly advocating a position that TLG is worth less than Shui's valuation suggested, thus harming TLG by undermining its position in the event of a potential sale to an outsider.

58. Thus, despite the fact that the KK Defendants clearly should have no dog in this fight, they have improperly and unethically sided with Wang and Fan and against Shui in a manner which is more likely to harm the company than help it.

59. Lopez further illustrated in his March 30 letter the KK Defendants' obvious bias in favor of Wang and Fan and against Shui by blindly advocating for Wang's and Fan's personal

counsel's legal position on the interpretation of the Operating Agreement and rejecting Shui's counsel's contrary legal position. This is not only completely improper and unethical, but, as discussed above, it is actually contrary to the legal position previously espoused by Unger and the KK Firm when Shui first exercised her withdrawal and buyout rights. Again, the KK Defendants should have no dog in this intermember dispute. The fact that the KK Firm recently enlisted the assistance of Lopez, who is a litigation, not a corporate, attorney further underscores this point. So too does the fact that the KK Firm was retained by the company to assist in connection with the potential sale of the business, not to litigate intermember disputes among members, much less take sides in such disputes.

60.     Lopez further asserted in his March 30 letter the remarkable contention, without citation to law or TLG's Operating Agreement, that Shui was not authorized to conduct an appraisal of her own interest in TLG! This preposterous assertion was made despite the clear provisions in the Operating Agreement expressly calling for such appraisals and expressly permitting the sale of a member's interest to a third party, and despite the fact that Unger had previously indicated that Wang and Fan would be doing the exact same thing pursuant to the First Amendment to the Operating Agreement.

61.     Lopez further advised in his March 30 letter that any prospective purchaser with whom Shui engages must obtain information directly from TLG (while TLG denies Shui access to that same information) in a transparent attempt to manipulate any third-party assessment of the value of Shui's interest and frustrate her ability to obtain the highest possible purchase price. Not coincidentally, accomplishing exactly that will only assist Wang and Fan in purchasing Shui's interest at below market value, in contravention of the procedure and formula provided for in the Operating Agreement and First Amendment.

62.     Wang, Fan and the KK Defendants have gone out of their way to make any attempt to negotiate a third-party purchase of Shui's interest difficult, knowing that even the appearance that Shui's co-members will be hard to deal with will reduce the likelihood of Shui finding a reasonable third-party offer and will make, consequently, a lowball purchase of Shui's share by Wang and Fan more probable.

63.     In an outrageous parting note, Lopez concludes his March 30 letter with a not-so-subtle threat that Shui's interests will be harmed if her counsel continues to object to the KK Defendants' biased and wrongful conduct as purported counsel to TLG, stating that "[s]uch attacks on counsel do not in any way advance the interests of your client and may have the opposite effect." (Emphasis has been added.)

64.     Equally disturbing is the fact that Unger has recently repudiated her representation that Wang and Fan would be obtaining and paying for an appraisal in accordance with the Operating Agreement and the First Amendment and announced that TLG would instead be obtaining a competing appraisal to the Shui's Appraisal at the Company's cost, for which Shui would bear 37% of the cost. Shui was not consulted.

65.     The net result of the foregoing is that Shui is being forced to fight two law firms at her own expense, while paying for 37% of the legal fees of one of the opposing firms.  She is also being forced not only to pay for her own appraisal, but 37% of the cost of a competing appraisal based on the KK Defendants' allegation that Shui's Appraisal is grossly overstated. The KK Defendants, who are not even trying to hide their obvious bias, have aided and abetted, if not orchestrated, this clear oppression of Shui.

66.     The decision to cut Shui off from information about TLG has made it impossible for Shui to continue to function as a productive member of TLG.  This is exacerbated due to the

fact that TLG employees have been made well aware of the freeze-out.  Thus, Wang and Fan, with the assistance and at the advice of the KK Defendants, have poisoned TLG, perhaps irreparably, for Shui.

67.    Shui has recently learned that she will incur a significant tax exposure as a consequence of TLG's profits for the first quarter of 2023.  Wang has unilaterally declined to allow any distributions to the members contrary to the company's longstanding practice ever since it achieved significant profitability, a measure surely designed to harm Shui financially as punishment for her exercise of her rights as a member and to force her to accept a lowball offer. After all, Wang and Fan can easily pay their estimated taxes from the significant commissions they have earned, while Shui is forced to rely solely on distributions of profits.

68.    Throughout the course of the handling of TLG's affairs, and especially since Shui exercised her right to withdrawal by buyout, Wang and Fan, in collaboration and concert with the KK Defendants, have acted in a vexatious manner and otherwise not in good faith.

### FIRST COUNT
### Breach of Contract and Specific Performance of
### Article XV of the Operating Agreement
### (Wang and Fan)

69.    Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

70.    Shui has properly exercised her right to a withdrawal-by-sale of her interest to the other members pursuant to Article XV of the Operating Agreement of TLG.

71.    Through company counsel, Wang and Fan accepted Shui's exercise of her right to a withdrawal-by-sale.

72.     Thereafter, while Shui engaged and commenced work with her own appraisers in furtherance of the process contained in the First Amendment to the Operating Agreement, Wang and Fan, through separate counsel, repudiated their acceptance and obligations to follow through.

73.     As a direct and proximate result of Wang's and Fan's breach of the Operating Agreement and denial of Shui's right to a withdrawal-by-sale after they had already acknowledged same, Shui has suffered and will continue to suffer significant financial harm.

### SECOND COUNT
### Oppression Pursuant to N.J.S.A. §42:2C-48
### (Wang and Fan)

74.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

75.     As a consequence of the oppressive conduct of the Wang and Fan described hereinabove, it is not reasonably practicable to carry on TLG's activities in conformity with the Operating Agreement.

76.     Wang and Fan have acted and are acting in a manner that is illegal, including with respect to the handling of various human resources matters.

77.     Wang and Fan - particularly Wang, who holds unilateral authority over the business and wields it in her own interest to the derogation of the rights of Shui and even the best interests of TLG, itself - have acted and are acting in a manner that is oppressive and is and will be directly harmful to Shui.

78.     The most equitable resolution of these concerns would be enforcement of Article XV of the Operating Agreement and the process for administering the withdrawal-by-sale right set forth in the First Amendment to the Operating Agreement.  Dissolution, on the other hand, would

be detrimental to TLG and all of the members, Shui included, because the business does not rely upon or own significant tangible or saleable assets beyond its operations as an ongoing concern.

### THIRD COUNT
### Direct Action on behalf of a Member to Enforce her Rights
### N.J.S.A. §42:2C-67
### (Wang, Fan and the KK Defendants)

79.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

80.     Shui has been denied access to information essential both to her ability to continue to serve in her role within TLG and to her ability to solicit third-party purchasers for her interest in TLG, which is her right pursuant to Article XV of the Operating Agreement.

81.     Shui has also been cut off from company counsel by Wang, Fan and the KK Defendants, who have deprived her of her right to know and understand the advice being given to TLG by the KK Defendants in their alleged capacity as company counsel.

82.     As a direct and proximate result of the other members' and the KK Defendants' denial of these rights belonging to Shui under the Operating Agreement, Shui has been and will continue to be harmed.

### FOURTH COUNT
### Breach of the Statutory Standards of Conduct for Members in an LLC
### N.J.S.A. §42:2C-39
### (Wang and Fan)

83.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

84.     Wang and Fan have, in connection with the conduct of TLG's business, engaged in intentional misconduct and knowing violations of law, including but not limited to with respect to certain human resources issues described hereinabove.

85.     Wang and Fan have failed to discharge their duties to TLG in a manner consistent with the contractual obligation of good faith and fair dealing.

86.     As a direct and proximate result of the foregoing breaches of Wang's and Fan's duties to Shui in their capacities as member-managers of TLG, Shui has been and will continue to be harmed.

**FIFTH COUNT**
**Breach of Fiduciary Duty**
**(Wang, Fan and the KK Defendants)**

87.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

88.     As member-managers of TLG, Wang and Fan owe Shui a fiduciary duty, both pursuant to N.J.S.A. §42:2C-39 and at common law, to refrain from engaging in the management of TLG's business in a manner that involves intentional misconduct or knowing violations of the law.

89.     The conduct of Wang and Fan of the management of TLG, as is described hereinabove in detail, involved both intentional misconduct and knowing violations of law.

90.     Further, upon information and belief, Wang and Fan have taken, or are planning to take, steps to devalue or dissolve TLG solely in an effort to harm Shui.

91.     As purported company counsel to TLG, the KK Defendants owe Shui a fiduciary duty to refrain from playing favorites in a dispute among the members and to refrain from engaging in conduct designed to assist Wang and Fan in their efforts to oppress Shui and deprive her of her rights as a member in TLG.

92.     The conduct of the KK Defendants in their purported capacity as TLG counsel, as is described hereinabove in detail, constituted a breach of their fiduciary duties to Shui.

93.     As a direct and proximate consequence of Wang's, Fan's and the KK Defendants' breaches of their statutory and common-law fiduciary duties, Shui has been and will continue to be harmed.

## SIXTH COUNT
### Civil Conspiracy/Aiding and Abetting of the Oppression and Breach of Fiduciary Duty
### (Wang, Fan, the KK Defendants and John Does 1-10)

94.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

95.     The Defendants have conspired with one another to commit the foregoing wrongful and actionable conduct.

96.     Defendants acted in concert to commit the foregoing wrongful and actionable conduct.

97.     Defendants entered into an illicit agreement to inflict a wrong against Shui.

98.     Each Defendant understood the objectives of the scheme, accepted them and agreed, either implicitly or explicitly, to do his, her or its part to further them.

99.     Defendants engaged in the conduct described hereinabove in detail with actual malice or wanton and willful disregard of the rights of Shui, who stood to be foreseeably harmed.

100.    The KK Defendants and John Does (1-10) aided and abetted the oppressions and breaches of fiduciary duty on the part of Wang and Fan.

## SEVENTH COUNT
### Breach of the Covenant of Good Faith and Fair Dealing
### (Wang and Fan)

101.    Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

102.    As parties to the Operating Agreement, Wang and Fan owe Shui a duty of good faith and fair dealing.

103.    Wang's and Fan's efforts to frustrate Shui's ability to enjoy the benefits of her ownership in TLG, including but not limited to their efforts to frustrate Shui's contractually recognized right to seek third-party purchasers for her interest, constitute a breach of that duty.

104.    As a direct and proximate consequence of Wang's and Fan's breach of their covenant of good faith and fair dealing, Shui has been and will continue to be harmed.

**EIGHTH COUNT**
**Intentional Infliction of Emotional Distress**
**(Wang, Fan, the KK Defendants and John Does (1-10)**

105.    Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

106.    Armed with knowledge of Shui's serious health concerns, Defendants have engaged in extreme and outrageous conduct, as described above.

107.    In addition, Wang and Fan have gone out of their way to make working together in TLG difficult and emotionally taxing on Shui.

108.    Wang, in particular, has been insulting, condescending and rude throughout the parties' dealings.

109.    Defendants' conduct in this regard has been intentional or, at the very least, reckless.

110.    The distress caused by Defendants has been so severe that it could be expected by any reasonable person to adversely affect Shui's mental health and to exacerbate her existing health issues.

111.    As a direct and proximate result of Defendants' intentional infliction of emotional distress upon her, Shui has suffered and will continue to suffer harm.

**WHEREFORE,** Shui demands judgment for the following relief:

a.   Enforcing Shui's right to a withdrawal-by-sale pursuant to Article XV of the Operating Agreement of TLG;

b.   In the alternative, ordering a buy-out of Shui's interest in TLG by Wang and Fan in furtherance of the Court's equitable powers under the New Jersey Limited Liability Act at a price determined in accordance with the First Amendment to the Operating Agreement;

c.   Compelling Wang, Fan and the KK Defendants to restore Shui's access to the bank accounts, financial records and other business records of TLG, including all legal advice and related correspondence;

d.   Awarding Shui compensatory damages against all Defendants, jointly and severally;

e.   Awarding Shui punitive damages against all Defendants, jointly and severally;

f.   Awarding Shui pre- and post-judgment interest against all Defendants, jointly and severally;

g.   Awarding Shui her attorneys' fees against all Defendants, jointly and severally;

h.   Awarding Shui her costs of suit against all Defendants, jointly and severally; and

i.   For such further relief as this Court deems just.

Dated April 16, 2023

By: _/s/ Scott D. Baron_

Scott D. Baron, Esq.

### JURY DEMAND

Pursuant to R. 1:8-1(b) and R. 4:35-1(a), Plaintiff Jo Shui demands a trial by jury on all of the triable issues of this Complaint.

## DESIGNATION OF TRIAL COUNSEL PURSUANT TO R. 4:25-4

Scott D. Baron, Esq. is hereby designated as trial counsel pursuant to R. 4:25-4.

Dated April 16, 2023

By: */s/ Scott D. Baron*

Scott D. Baron, Esq.

## CERTIFICATIONS

In accordance with R. 4:5-1, I hereby certify that the matter in controversy is not subject to any other action pending in any court or arbitration proceeding; there is no other action or arbitration proceeding contemplated; and that to the best of my knowledge, no other party should be joined in this action at the present time, except as discovery may reveal.

I further certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated April 16, 2023

By: */s/ Scott D. Baron*

Scott D. Baron, Esq.

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

| | |
|---|---|
| JOSEPHINE SHUI, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | MORRIS COUNTY: CHANCERY DIVISION – GENERAL EQUITY PART |
| v. | DOCKET NO.: MRS-C-30-23 |
| LEI WANG, HENGCHUN "HELENA" FAN, MERYL L. UNGER, ESQ., THOMAS M. LOPEZ, ESQ., KATSKY KORINS LLP and JOHN DOES (1-10), | CIVIL ACTION |
| | **NOTICE OF APPEARANCE** |
| Defendants. | |

**PLEASE TAKE NOTICE** that Elliott Joffe, Esq., an attorney with the law firm of Baron Samson LLP, 27 Horseneck Road, Suite 210, Fairfield, New Jersey 07004, hereby enters his appearance as counsel for the Plaintiff Josephine Shui in the above-captioned matter.

**BARON SAMSON LLP**

*/s/ Elliott Joffe*
***Elliott Joffe**, **Esq.***

Dated:  April 17, 2023

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

| | |
|---|---|
| JOSEPHINE SHUI,<br><br>             Plaintiff,<br><br>v.<br><br>LEI WANG, HENGCHUN "HELENA"<br>FAN, MERYL L. UNGER, ESQ., THOMAS<br>M. LOPEZ, ESQ., KATSKY KORINS LLP<br>and JOHN DOES (1-10),<br><br>             Defendants. | SUPERIOR COURT OF NEW JERSEY<br>MORRIS COUNTY: CHANCERY DIVISION<br>– GENERAL EQUITY PART<br><br>DOCKET NO.: MRS-C-30-23<br><br>CIVIL ACTION<br><br>**SUMMONS** |

**From The State of New Jersey To The Defendant Named Above:**

**LEI WANG**

      Plaintiff Josephine Shui, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit. If you dispute the Complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov). If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00) if you want the court to hear your defense.

      If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov. A list of these numbers is also provided.

*/s/ Michelle M. Smith*
 Michelle M. Smith
Clerk of the Superior Court

Dated:  April 17, 2023

Name of Defendant to be Served:        Lei Wang

Address of the Defendant to be Served:    21 Gurney Street
Cambridge, Massachusetts 02138

2

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

| | |
|---|---|
| JOSEPHINE SHUI, | SUPERIOR COURT OF NEW JERSEY |
| | MORRIS COUNTY: CHANCERY DIVISION |
| Plaintiff, | – GENERAL EQUITY PART |
| | |
| v. | DOCKET NO.: MRS-C-30-23 |
| | |
| LEI WANG, HENGCHUN "HELENA" | CIVIL ACTION |
| FAN, MERYL L. UNGER, ESQ., THOMAS | |
| M. LOPEZ, ESQ., KATSKY KORINS LLP | **SUMMONS** |
| and JOHN DOES (1-10), | |
| | |
| Defendants. | |

**From The State of New Jersey To The Defendant Named Above:**

**HENGCHUN FAN**

Plaintiff Josephine Shui, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit.  If you dispute the Complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov).  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971.  A filing fee payable to the Treasurer, State of New Jersey must accompany your answer or motion when it is filed.  You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above.  A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit.  If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

   If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov. A list of these numbers is also provided.


              */s/ Michelle M. Smith*
               Michelle M. Smith
               Clerk of the Superior Court

Dated: April 17, 2023

Name of Defendant to be Served:     Hengchun Fan

Address of the Defendant to be Served:   421 Bridoon Terrace
                 Encinitas, California 92024

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

| | |
|---|---|
| JOSEPHINE SHUI, <br><br> Plaintiff, <br><br> v. <br><br> LEI WANG, HENGCHUN "HELENA" FAN, MERYL L. UNGER, ESQ., THOMAS M. LOPEZ, ESQ., KATSKY KORINS LLP and JOHN DOES (1-10), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY MORRIS COUNTY: CHANCERY DIVISION – GENERAL EQUITY PART <br><br> DOCKET NO.: MRS-C-30-23 <br><br> CIVIL ACTION <br><br> **SUMMONS** |

**From The State of New Jersey To The Defendant Named Above:**

### KATSKY KORINS LLP

Plaintiff Josephine Shui, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit. If you dispute the Complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov). If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

   If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov. A list of these numbers is also provided.

             */s/ Michelle M. Smith*

              Michelle M. Smith
              Clerk of the Superior Court

Dated: April 17, 2023

Name of Defendant to be Served:    Katsky Korins LLP

Address of the Defendant to be Served:  605 Third Avenue
                  New York, New York 10158

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

| | |
|---|---|
| JOSEPHINE SHUI, | SUPERIOR COURT OF NEW JERSEY MORRIS COUNTY: CHANCERY DIVISION – GENERAL EQUITY PART |
| Plaintiff, | |
| v. | DOCKET NO.: MRS-C-30-23 |
| LEI WANG, HENGCHUN "HELENA" FAN, MERYL L. UNGER, ESQ., THOMAS M. LOPEZ, ESQ., KATSKY KORINS LLP and JOHN DOES (1-10), | CIVIL ACTION **SUMMONS** |
| Defendants. | |

**From The State of New Jersey To The Defendant Named Above:**

**MERYL L. UNGER, ESQ.**

Plaintiff Josephine Shui, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit. If you dispute the Complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov). If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov. A list of these numbers is also provided.

*/s/ Michelle M. Smith*
 Michelle M. Smith
Clerk of the Superior Court

Dated:  April 17, 2023

Name of Defendant to be Served:         Meryl L. Unger, Esq.

Address of the Defendant to be Served:  c/o Katsky Korins LLP
                                        605 Third Avenue
                                        New York, New York 10158

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

|  |  |
|---|---|
| JOSEPHINE SHUI,<br><br>                    Plaintiff,<br><br>v.<br><br>LEI WANG, HENGCHUN "HELENA"<br>FAN, MERYL L. UNGER, ESQ., THOMAS<br>M. LOPEZ, ESQ., KATSKY KORINS LLP<br>and JOHN DOES (1-10),<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>MORRIS COUNTY: CHANCERY DIVISION<br>– GENERAL EQUITY PART<br><br>DOCKET NO.: MRS-C-30-23<br><br>CIVIL ACTION<br><br>**SUMMONS** |

**From The State of New Jersey To The Defendant Named Above:**

**THOMAS M. LOPEZ, ESQ.**

Plaintiff Josephine Shui, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit. If you dispute the Complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov). If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov. A list of these numbers is also provided.

*/s/ Michelle M. Smith*
 Michelle M. Smith
Clerk of the Superior Court

Dated:  April 17, 2023

Name of Defendant to be Served:          Thomas M. Lopez, Esq.

Address of the Defendant to be Served:    c/o Katsky Korins LLP
                                          605 Third Avenue
                                          New York, New York 10158

2

Scott D. Baron, Esq. (Attorney No. 042271994)
Elliott Joffe, Esq. (Attorney No. 041561995)
**BARON SAMSON LLP**
27 Horseneck Road, Suite 210
Fairfield, New Jersey 07004
(973) 244-0030
Attorneys for Plaintiff

|  |  |
|---|---|
| JOSEPHINE SHUI,<br><br>               Plaintiff,<br><br>v.<br><br>LEI WANG, HENGCHUN "HELENA"<br>FAN, MERYL L. UNGER, ESQ., THOMAS<br>M. LOPEZ, ESQ., KATSKY KORINS LLP<br>and JOHN DOES (1-10),<br><br>               Defendants. | SUPERIOR COURT OF NEW JERSEY<br>MORRIS COUNTY: CHANCERY DIVISION<br>– GENERAL EQUITY PART<br><br>DOCKET NO.: MRS-C-30-23<br><br>CIVIL ACTION<br><br>**FIRST AMENDED COMPLAINT AND JURY<br>DEMAND** |

Plaintiff, JOSEPHINE SHUI, by way of Complaint against Defendants, LEI WANG, HENGCHUN "HELENA" FAN, MERYL L. UNGER, ESQ., THOMAS M. LOPEZ, ESQ., KATSKY KORINS LLP and JOHN DOES (1-10), by and through her attorneys Baron Samson LLP, says the following:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Jo Shui ('Shui') resides at 3 Herman Way, Towaco, New Jersey.

2.     Defendant Lei Wang ("Wang") resides at 21 Gurney Street, Cambridge, Massachusetts.

3.     Defendant Hengchun Fan ("Fan"), who goes by the name "Helena," resides at 421 Bridoon Terrace, Encinitas, California.

4.     Shui, Wang and Fan are the only members in The Lotus Group, LLC ("TLG"), a New Jersey limited liability company with a principal business address located at 330 Changebridge Road, Suite 101, Pine Brook, Morris County, New Jersey.

5.      Defendants Meryl L. Unger, Esq. ("Unger") and Thomas M. Lopez, Esq. ("Lopez") are attorneys employed by Defendant Katsky Korins LLP (the "KK Firm"), a law firm located at 605 Third Avenue, New York, New York 10158.  At all times relevant hereto, Unger and Lopez acted within the scope of their employment at the KK Firm, thereby rendering it vicariously liable for their conduct.  (Lopez, Unger and the KK Firm will collectively be referred to herein as the "KK Defendants.")  The KK Defendants purport to act as company counsel to TLG, but they have aided and abetted the wrongs alleged in this action on the part of Wang and Fan and/or have engaged in a conspiracy with Wang and Fan to commit the wrongs set forth herein.

6.      Defendants John Does (1-10) are individuals or entities whose identities may be unknown to Shui and who, upon information and belief, have aided and abetted the wrongs alleged in this action on the part of Wang and Fan and/or have engaged in a conspiracy with Wang and Fan to commit the wrongs set forth herein.

7.      Shui's claims in this action arise largely out of the management and operations of TLG and the contractual relations between the members in TLG, a New Jersey limited liability company with offices in New Jersey, as set forth in TLG's Operating Agreement.  The KK Defendants provided legal advice regarding the operations of TLG, a New Jersey limited liability company, which necessarily implicated New Jersey law (although neither Unger nor Lopez is licensed to practice law in New Jersey).  Wang and Fan own significant property located in New Jersey consisting, at least, of their respective membership interests in TLG.  Consequently, the courts of the State of New Jersey have jurisdiction over this action and the parties.

8.      Both Shui and TLG reside in Morris County, and the claims set forth herein arose in Morris County, making it an appropriate venue for this action.

## FACTS COMMON TO ALL COUNTS

9.      TLG is a boutique employment agency and recruiting firm specializing in the placement of temporary and permanent personnel in the biometrics field.  Such personnel include biostatisticians, statistical programmers and data managers. TLG primarily serves the pharmaceutical industry.

10.      TLG was formed via filing with the Secretary of State of New Jersey on or about January 25, 2013.

11.      On or about May 1, 2013, Shui, Wang and Fan entered into the Operating Agreement for TLG (the "Operating Agreement").  Shui, Wang and Fan are, and have been, the only members in TLG.

12.      Pursuant to the Operating Agreement, ownership in TLG is allocated as follows: 51% to Wang, 37% to Shui and 12% to Fan.  Nearly every decision requiring a vote of the members is, according to the Operating Agreement, subject to a simple majority vote, meaning Wang wields essentially unlimited and unilateral power to determine the course of the company and every significant decision affecting its management and affairs.

13.      The Operating Agreement entitles every member to access to the books and records of the company which would include, without limitation, communications between members of TLG and company counsel.

14.      Article XV of the Operating Agreement, entitled "Withdrawal of Member by Sale or Transfer of Stock," specifically permits each member to sell or transfer her interest in TLG to a third party subject only to the other members' right of first refusal.  The same section further provides that "[s]hould any member be desirous of … withdrawing without a third party offer, the purchase price to the other members <u>shall</u> be as calculated per the provisions of Section XVI of"

the Operating Agreement (emphasis added).  The same section further provides that "[p]ayment for the selling/withdrawing member's membership shall be made by the purchasing member in equal annual payments over a five year period without interest." (emphasis added)

15.     Originally, Section XVI(d) of the Operating Agreement provided that "[t]he purchase price … shall be equal to the amount as listed in [the selling member's] Capital Account as referenced in the books and records of" TLG.

16.     The Operating Agreement also incorporated resolutions and minutes of even date.

17.     According to the Organizational Resolutions Adopted by the Members of TLG on May 1, 2013 and incorporated into the Operating Agreement, each member was to be a managing member entitled to an annual salary "Not to exceed $1,000,000."  Despite this provision, the members, who expected that the administrative and operations tasks within the business would likely be minimal as TLG was a service business start-up, agreed, at the very beginning of the operation of TLG, to forego salaries.

18.     The members were also assigned operational responsibilities.  Shui and Fan were to be involved in recruiting, and Wang was to be involved in client development.  Shui and Wang were to share operations and management responsibilities, with Fan, who had elected to work part-time at the outset, to assume some of those responsibilities if she commenced working full-time.  Again, the members agreed to forego salaries for these operations and management responsibilities, relying upon commissions and any distributions from the business as their sole sources of income from the business.

19.     Although, according to the minutes incorporated into the Operating Agreement, the members were to share in management and operations responsibilities, a disproportionate share of those responsibilities fell upon Shui.  Shui had ten years of experience in the field of human

resources prior to the formation of TLG and was the sole native English-speaker among the three members.   For these reasons, Shui was tasked with reviewing contracts and handling a disproportionate share of the administrative and human resources tasks.  As a direct consequence, Shui was unable to devote the same portion of her time as the other members to commission-earning tasks.  The predictable result was that Shui financially benefited the least from her efforts in support of the business.

20.     This was especially true when the business took off at a surprising pace, and, as a direct result, the administrative and operations tasks mounted almost immediately.

21.     Shui was primarily responsible for developing and implementing TLG's infrastructure, human resources, training, securing health insurance and other employee benefits and choosing and setting up payroll systems and applicant tracking procedures.  Shui was also responsible for reviewing contracts and handling banking for the business.  Thus, Wang and Fan were able to focus their efforts on commission-earning tasks while Shui built and managed the administrative processes of the business through non commission-earning tasks.

22.     The business became profitable very quickly.  As a result, Wang and Fan began to earn substantial annual commissions, while Shui, to whom was relegated a disproportionate share of the operations and management work for which the company was still paying no salary, earned far less than Wang and Fan.

23.     Shui's efforts to persuade Wang, who effectively controlled the company by virtue of her majority membership interest, to agree to managerial salaries once the business had become profitable and demonstrated rapid growth and once it became apparent that Shui was going to be handling the majority of the administrative and operations tasks, were met with utter refusal. Indeed, Wang informed Shui that she would never be paid any salary for all of her operations and

management work.  On one occasion, Wang, in a condescending and demeaning manner and tone, stated to Shui "Dear, you will never get a salary."

24.     Furthermore, distributions from the business, which were withheld for a period of one or two years, were calculated so as to cover little more than the taxes the members would owe due to the business's taxable earnings each year.  During the first two to three years of operations, Shui and her husband were forced to borrow money to pay taxes she owed as a consequence of the undistributed earnings of the company.

25.     Thus, due to her willingness to perform a significant and disproportionate share of the non-commission-based work, Shui was far less compensated than Wang and Fan, whose work consisted mostly of commission-based work, such as recruiting and client development.  Shui's reasonable expectations upon entering into the Operating Agreement, to wit, that she would derive financial benefits from TLG's business success proportionate to her ownership stake and merited by her efforts in furtherance of that business, were frustrated due to the unfair and oppressive policies implemented and enforced by Wang, with Fan's cooperation and assent.

26.     On or about June 1, 2018, the Operating Agreement was amended via the First Amendment to Operating Agreement for TLG (the "First Amendment"), which was executed by all three members.

27.     The essence of the First Amendment was to replace the purchase price provided in Section XVI(d) with a process whereby the purchasing members would first obtain an appraisal, after which the selling member may obtain her own competing appraisal, and failing a substantial agreement among the two appraisers, the appraisers choose a third appraiser, whose appraisal would be determinative of the price.  The price is to "be based upon the total fair market value of [TLG], less any debt or other financial obligations."

28.     The First Amendment represented a compromise, as TLG had received advice of counsel at the time to enter into a separate, more detailed and thorough buy-sell agreement. Counsel to TLG at the time (since replaced by Wang) had advised that TLG either obtain regular valuations or, at the very least, develop a formula for any buy-out of a member's interest by the other members that the members could agree upon in advance in order to simplify the buy-out process.  It was Wang who ultimately vetoed this idea, ignoring then corporate counsel's prudent advice.

29.     Despite the plain language of the First Amendment to the contrary, Wang has repeatedly over the years insisted in conversations and communications with Shui that any sale by one member to the others should be at some discounted value, betraying her premeditated intentions to lowball Shui in the event that the latter ever sought to exercise her withdrawal by buy-out rights.

30.     Over time, tensions developed between Shui and the other members over various human resources issues, including but not limited to Wang's decision to have applicants asked about their citizenship status in violation of law, discriminatory recruitment and compensation practices implemented by Wang, and TLG's handling of other human resources and employment matters in a potentially illegal manner.  By way of example, and not limitation, in one instance, Wang instructed recruiters to disregard applicants of a particular ethnicity for a particular job opening, a step that was not only extremely distasteful and ugly but also exposed TLG to potential liability.  Most recently, this tension has arisen yet again around Shui's reasonable inquiries into the handling of an employment-related matter.  These various human resources actions by Wang made Shui extremely uncomfortable, but, as a minority member, Shui was obviously powerless to stop them.

31.     In June of 2021, Shui suffered a serious health setback, which caused her to reevaluate her priorities and, in particular, the stress of dealing with Wang's authoritarian and often discriminatory approach to managing TLG.

32.     In or about July 2021, Wang unilaterally decided to replace TLG's company counsel, who had been representing and advising the company since its inception, with Unger of the KK Firm, with whom she had her own pre-existing personal relationship and friendship.  In retrospect, that move was clearly the first step in an orchestrated and coordinated plan to take advantage of Shui's health issues to force her to accept a lowball offer for her interest in contravention of the procedures and calculations provided for in the Operating Agreement and the First Amendment.

33.     The KK Firm engagement letter, which was executed by Unger on behalf of the KK Firm and by Wang on behalf of TLG, specifically stated that the scope of the engagement was "to represent [TLG] in connection with a potential sale of its business…." at an hourly rate for Unger of $760.  Shui met Unger for the first time in a Zoom meeting in July 2021.  During that meeting, Shui asked Unger whether Unger, given her preexisting relationship with Wang, would be representing Wang or the company in the event of a sale or buyout of membership interests by other members.  Unger specifically responded that this was "an excellent question," and that separate representation of the members was standard and recommended.  Unger also advised that, in the event of such a sale or buyout, she would represent both the company and Wang, individually, pursuant to a separate retainer agreement.  Unger failed to disclose that dual representation under those circumstances would, in fact, be an unethical conflict of interest.

34.     In the summer of 2021, TLG also engaged a broker to assist the company in seeking a potential buyer.  The broker's efforts resulted in at least three preliminary offers which

collectively established a significant fair market value on the company within a range that Wang and Fan have repeatedly failed to acknowledge since. In 2020, TLG had obtained an appraisal of the business based on 2019 closing numbers (the "2019 Appraisal"), and the offers received in 2021 were nearly twice that figure due to the tremendous year-after-year growth in the company's revenues and profits.  However, none of those offers resulted in a consummated deal, and at least one of the offers was retracted in part due to TLG's potential mischaracterization of employees as independent contractors.  Wang exercised unilateral control over the entire process, including the choice of broker, and her decisions impaired TLG's ability to find a buyer and consummate a deal.

35.     While she did not resign or seek to withdraw from the company, in or about February 2022, due to her ongoing health issues, Shui did approach Wang and Fan with a request that they develop a plan for her exit within the next year or so in the hopes of accomplishing an amicable withdrawal on a schedule that would not harm TLG.

36.     After failing to respond in any substantive way to Shui's repeated attempts to negotiate an amicable resolution for nearly a year, Wang and Fan made an insultingly lowball offer to Shui for a majority of her interest in the company.  Extrapolating from their offer, they had valued the entire company, in or about 2022, at around half of the value established by the 2019 Appraisal, despite the extraordinary growth and the much higher offers that TLG had received. Thus, the clear intent to utilize Wang's unilateral control over the business and to take advantage of Shui's health concerns to force Shui to accept a lowball buy-out was clearly exposed.

37.     On or about January 17, 2023, Shui notified Wang and Fan via a letter from counsel of Shui's intention to exercise the withdrawal-by-sale right contained in Article XV of the Operating Agreement.

38.     After a brief exchange between Unger and Shui's counsel, which included Unger requesting, and Shui's counsel providing, copies of the applicable agreements containing Ms. Shui's buyout rights, Unger advised Shui's counsel in writing, pursuant to Article XVI(d) of the First Amendment to the Operating Agreement, of the intention of the other members to commence the appraisal process as described therein.  Unger further advised that Ms. Wang and Ms. Fan would be engaging the appraiser and paying for the appraisal called for in the First Amendment to the Operating Agreement.

39.     Shui, in preparation for this process, engaged her own appraisal firm through counsel and requested some basic information from TLG's accountants to provide to such firm so that they could provide an appraisal of Shui's interest consistent with her buyout rights ("Shui's Appraisal").

40.     Shortly after Unger announced that the appraisal process set forth in the First Amendment to the Operating Agreement would commence, Wang and Fan, through their own joint personal counsel, completely reversed course and advised that, notwithstanding Unger's prior representations to the contrary, that they had no intention of honoring Shui's exercise of her withdrawal-by-sale right contained in Section XV of the Operating Agreement, as amended.

41.     Not long after personal counsel to Wang and Fan repudiated the agreement to commence the appraisal process, both personal counsel to Wang and Fan and the KK Defendants began accusing Shui of interfering with the business by her making inquiries about such topics as the proper handling of human resources matters and by her making requests for basic accounting information, which is both her right as a member and essential to her ability to exercise her withdrawal and buyout rights set forth in the Operating Agreement, consistent with Unger's prior representations.

42.     The KK Defendants also began using Shui's health concerns against her by interpreting her efforts to agree upon an appropriate buy-out for over a year and her exercise of her withdrawal by buy-out right as purported evidence that Shui had abandoned her role in the company and withdrawn <u>unconditionally</u> as a member, which was clearly not the case.

43.     Particularly troubling about the KK Defendants' decision to weigh in on the side of Wang in this intermember dispute was their abject failure to conduct any kind of investigation, in their purported capacity as company counsel, before accepting as true Wang's allegations of wrongdoing by Shui while utterly ignoring Shui's allegations of wrongdoing by Wang.  This would commence a disturbing pattern of TLG's so-called company counsel blindly taking Wang's side in this intermember dispute and conflating Wang's personal interests with those of TLG.

44.     For example, contemporaneously with the KK Defendants' and Wang's absurd allegations against Shui, Wang took steps to cut off Shui's access to bank records and ability to engage in banking activities essential to Shui's administrative and human resources work on behalf of TLG, activities which Shui had handled since the inception of TLG.  The KK Defendants' response to Shui's counsel's objections to this action was, once again, to side with Wang over Shui without any apparent investigation whatsoever, simply accepting Wang's allegations as true and utterly ignoring Shui's allegations against Wang, including allegations of conduct clearly harmful to TLG.  Remarkably, the KK Defendants utterly failed to even contact Shui to ascertain either her position as to Wang's unfounded allegations or her own allegations against Wang.

45.     Meanwhile, despite repeated demand, Shui has been frozen out of, and denied access to, any and all legal communications and advice provided to TLG by the KK Defendants over the past several years, notwithstanding Shui's undeniable right to such communications and

advice as a manager-member of TLG.  This is particularly disturbing and outrageous considering the fact that Shui has effectively paid 37% of KK's legal fees over the course of that entire period.

46.     It has recently come to Shui's attention that Wang has caused TLG to abruptly cease efforts to sell TLG's business without any consultation with Shui.  This occurred despite the fact that ongoing conversations with one prospective purchaser had been underway but had been put "on hold," upon information and belief, in accordance with the unilateral instructions of Wang.  Upon information and belief, this decision was made unilaterally by Wang, perhaps with Fan's knowledge, but Shui was forced to learn about it after the fact via her own independent inquiries.  Based upon communications between and among the parties, including specifically communications from the KK Defendants, and upon further information and belief, this was done in order to force Shui to accept an insultingly lowball offer for her interest in TLG from Wang and Fan before they turn around and sell the company (including the interest purchased at a low-ball "gunpoint" price from Shui) for true fair market value.

47.     Administrative staff of TLG have been directed by Wang to deny Shui basic information about the business that is necessary both to Shui's continued work on the company's behalf and to her efforts to evaluate and market her share in the business.

48.     Wang, in collaboration with Fan and the KK Defendants, continues to make unilateral decisions that have significant potential to negatively impact the business and its value and to harm and oppress Shui personally.  One example was Wang's unilateral decision to change TLG's employee health care plan, resulting in significantly greater cost to employees with no notice to Shui or to the employees, causing chaos and severe harm to employee morale.  Wang compounded this error by paying select employees bonuses to cover their increased premiums but

did so on an arbitrary and/or discriminatory basis. Again, this made Shui extremely uncomfortable, but, given her minority interest, she was powerless to veto or change.

49.     More recently, upon Shui's engagement of counsel to enforce her withdrawal and buyout rights and said counsel's providing Wang's and Fan's personal counsel and the KK Defendants with Shui's Appraisal of her interest pursuant thereto, the KK Defendants have gone to extraordinarily lengths to protect Wang's personal interests to the detriment of Shui and to assist in Wang's and Fan's oppression of Shui.

50.     On March 17, 2023, Unger, via an email to Shui's attorneys, insisted that, despite Shui's clearly recognized right to seek third-party offers for her interest in TLG, "Jo has no authority to disclose (directly or indirectly) any company information to any third party." No citation to any law or contractual provision was offered. Aside from the legal inaccuracy of this statement, it was clearly intended to chill Shui's exercise of her right to seek a third-party purchaser for her interest.

51.     For example, on March 30, 2023, Lopez authored a letter to Shui's counsel which plainly illustrates the KK Defendants' absolute bias and failure to impartially represent TLG in this dispute among its members. The letter begins with an assertion that Shui is accusing TLG of oppressing her, a characterization that ignores both the language of Shui's counsel's prior correspondence and the very nature of oppression, as described in N.J.S.A. §42:2C-48(a)(5)(b), which describes minority member oppression as the conduct of "those members in control of the company."

52.     That the mischaracterization of Shui's claims as claims against TLG, rather than against Wang and Fan, was not an inadvertent misstatement became clear when, later in the same letter, Lopez absurdly asserted that Shui "assumed a position adverse to" TLG when she engaged

13

counsel in connection with her withdrawal and buyout rights.   This was then cited by Lopez as the transparent excuse for freezing Shui out of all of the KK Firm's communications and legal advice to the company including flatly rejecting Shui's demand for copies of all of the KK Firm's communications and legal advice provided to TLG over the past several years, advice to which Shui is clearly entitled and for which she effectively paid 37% of all fees associated therewith. That the KK Defendants have intentionally conflated TLG's interests with Wang's personal interests only underscores that they have ceased acting as company counsel, if indeed they ever had, and have chosen to act in all ways as though they were personal counsel to Wang.

53.    The KK Defendants' contention that Shui was somehow adverse to TLG simply as a consequence of her engaging counsel in connection with her withdrawal and buyout rights was manufactured in furtherance of the KK Defendants' ongoing campaign to assist Wang and Fan in their oppression of Shui under the guise of somehow protecting the Company.   In this regard, the KK Defendants, while hiding behind this bogus excuse, not only flatly refused Shui's request for the KK Firm's files relating to its legal advice given to TLG since Shui engaged counsel but, remarkably, this freezeout and refusal somehow even extended to legal advice given prior to the alleged (and utterly fictional) adversity between Shui and TLG.

54.    The fact that Shui's engagement of separate counsel in connection with her withdrawal and buyout rights did not create adversity with TLG was previously acknowledged by Unger multiple times, including in the aforementioned Zoom meeting in July 2021 during which she stated that engagement by members of separate counsel under such circumstances is standard and recommended.

55.    The fact that Shui's engagement of counsel in connection with her withdrawal and buyout rights did not create adversity with TLG has also been acknowledged by Wang and Fan

multiple times over the past several years. Indeed, Wang and Fan had always acknowledged that separate personal counsel would be warranted when it came time for either a sale of the company or a buyout of Shui's interests. For example, on or about November 23, 2021, when discussing a potential sale of the company and the KK Firm's role in connection therewith, Fan advocated for separate counsel for the members, stating in an e-mail to Shui that "Meryl [Unger] is Lei [Wang's] friend. I am not sure if she can represent all of us and be the middle person." More recently, Shui has mentioned in numerous emails to Wang and Fan the advisability of retaining separate counsel under the circumstances, to which Wang and Fan interposed no objection or opposition.

56.     Lopez, in his letter of March 30, also improperly opined as to the merits of Shui's Appraisal prepared at Ms. Shui's expense pursuant to her withdrawal and buyout rights, going so far as to state his understanding that the appraisal is "deeply flawed" and sets forth a "grossly inflated valuation" of Shui's membership interests. In so doing, he once again once betrayed that the KK Defendants are acting not as company counsel but rather as Wang's personal counsel, advancing her interests to the detriment of Shui's. After all, pursuant to the Operating Agreement, the buy-out is between Wang and Fan, as purchasers, and Shui, as seller.

57.     The fact that purported company counsel, who should be completely indifferent as to the valuation of one member's interest for purposes of a buyout of that interest by the other members, would take a position in support of Wang and Fan and to the detriment of Shui, is remarkable. Such obvious attempts by the KK Defendants to assist Wang and Fan in their attempt to lowball Shui in this purely intermember issue is even more outrageous considering that Shui is not only effectively paying 37% of KK's legal fees but is now being forced by Wang, as communicated by the KK Firm, to pay 37% for a competing valuation against her interests. Worse,

Lopez is seemingly advocating a position that TLG is worth <u>less</u> than Shui's valuation suggested, thus harming TLG by undermining its position in the event of a potential sale to an outsider.

58.     Thus, despite the fact that the KK Defendants clearly should have no dog in this fight, they have improperly and unethically sided with Wang and Fan and against Shui in a manner which is more likely to harm the company than help it.

59.     Lopez further illustrated in his March 30 letter the KK Defendants' obvious bias in favor of Wang and Fan and against Shui by blindly advocating for Wang's and Fan's personal counsel's legal position on the interpretation of the Operating Agreement and rejecting Shui's counsel's contrary legal position.  This is not only completely improper and unethical, but, as discussed above, it is actually contrary to the legal position previously espoused by Unger and the KK Firm when Shui first exercised her withdrawal and buyout rights.  Again, the KK Defendants should have no dog in this intermember dispute.  The fact that the KK Firm recently enlisted the assistance of Lopez, who is a litigation, not a corporate, attorney further underscores this point.  So too does the fact that the KK Firm was retained by the company to assist in connection with the potential sale of the business, not to litigate intermember disputes among members, much less take sides in such disputes.

60.     Lopez further asserted in his March 30 letter the remarkable contention, without citation to law or TLG's Operating Agreement, that Shui was not authorized to conduct an appraisal of her own interest in TLG!  This preposterous assertion was made despite the clear provisions in the Operating Agreement expressly calling for such appraisals and expressly permitting the sale of a member's interest to a third party or the other members and despite the fact that Unger had previously indicated that Wang and Fan would be doing the exact same thing pursuant to the First Amendment to the Operating Agreement.

61.     Lopez further advised in his March 30 letter that any prospective purchaser with whom Shui engages must obtain information directly from TLG (while TLG denies Shui access to that same information) in a transparent attempt to manipulate any third-party assessment of the value of Shui's interest and frustrate her ability to obtain the highest possible purchase price, subject, of course, to Wang's and Fan's right of first refusal under the Operating Agreement.  Not coincidentally, accomplishing exactly that will only assist Wang and Fan in purchasing Shui's interest at below market value, in contravention of the procedure and formula provided for in the Operating Agreement and First Amendment.

62.     Wang, Fan and the KK Defendants have gone out of their way to make any attempt to negotiate a third-party purchase of Shui's interest difficult, knowing that even the appearance that Shui's co-members will be hard to deal with will reduce the likelihood of Shui finding a reasonable third-party offer and will make, consequently, a lowball purchase of Shui's share by Wang and Fan more probable.

63.     In an outrageous parting note, Lopez concludes his March 30 letter with a not-so-subtle threat that Shui's interests will be harmed if her counsel continues to object to the KK Defendants' biased and wrongful conduct as purported counsel to TLG, stating that "[s]uch attacks on counsel do not in any way advance the interests of your client <u>and may have the opposite effect</u>." (Emphasis has been added.)

64.     Equally disturbing is the fact that Unger has recently repudiated her representation that Wang and Fan would be obtaining and paying for an appraisal in accordance with the Operating Agreement and the First Amendment and announced that TLG would instead be obtaining a competing appraisal to the Shui's Appraisal at the company's cost, for which Shui would bear 37% of the cost. Shui was not consulted.

17

65.     The net result of the foregoing is that Shui is being forced to fight two law firms at her own expense, while paying for 37% of the legal fees of one of the opposing firms.  She is also being forced not only to pay for her own appraisal, but 37% of the cost of a competing appraisal based on the KK Defendants' allegation that Shui's Appraisal is grossly overstated. The KK Defendants, who are not even trying to hide their obvious bias, have aided and abetted, if not orchestrated, this clear oppression of Shui.

66.     The decision to cut Shui off from information about TLG has made it impossible for Shui to continue to function as a productive member of TLG.  This is exacerbated due to the fact that TLG employees have been made well aware of the freeze-out.  Thus, Wang and Fan, with the assistance and at the advice of the KK Defendants, have poisoned TLG, perhaps irreparably, for Shui.

67.     Shui has recently learned that she will incur a significant tax exposure as a consequence of TLG's profits for the first quarter of 2023.  Wang has unilaterally declined to allow any distributions to the members contrary to the company's longstanding practice ever since it achieved significant profitability, a measure surely designed to harm Shui financially as punishment for her exercise of her rights as a member and to force her to accept a lowball offer. After all, Wang and Fan can easily pay their estimated taxes from the significant commissions they have earned, while Shui is forced to rely solely on distributions to the members.

68.     In denying a release of funds to the members to cover their quarterly tax obligations, Wang and Fan have suddenly deviated from TLG's consistent practice of approximately seven (7) years.  TLG has previously released funds on at least a quarterly basis beginning a relatively short time after it became profitable in order to cover the members' tax liabilities.  This has been done for the benefit of all members, even though, unlike Shui, Wang and Fan have usually earned

sufficient commissions to cover the tax obligations imposed as a consequence of the company's profits.

69.     The clearly pretextual excuse given for the sudden decision to deny the members distributions relates to cash flows, which have often fluctuated.  TLG maintains large regular receivables and often relies upon its credit line to supplement its cash flows in the very short term in order to cover expenses such as payroll while awaiting payment from its largest clients.

70.     It cannot be coincidental that, upon the commencement of this dispute over Shui's invocation of her withdrawal by buyout right, the other members have chosen to deviate so completely from this long-standing practice.  They know very well that, because Shui's work is mostly noncommission-based while they earn substantial commissions in their respective roles, the denial of distributions to the members will hurt Shui far more than either of them.  Thus, they have employed a scorched earth policy to punish Shui for asserting her rights under the Operating Agreement and at law.

71.     Compounding this clearly oppressive and retaliatory step is Wang's plainly intentional efforts in recent weeks to sabotage Shui's candidate placement efforts.  Although Shui has been relegated mostly to administrative and managerial tasks, for which she is compensated solely through the kinds of distributions that Wang and Fan have just recently denied her, she does engage in some commission-based placement work for TLG.  However, as the client accounts are handled by Wang, Shui's placements cannot move forward without Wang's direct input and involvement.  Wang has, very recently and obviously as further retaliation for Shui's assertion of her rights, stalled and frustrated Shui's placement efforts in connection with a particular candidate by failing to contribute her own best efforts to support those efforts.  Thus, not only will Shui be

denied commissions as a consequence of Wang's further oppressive conduct, but TLG may also lose revenue as a direct result.

72.     Thus, Wang and Fan have now, in response to Shui's efforts to simply obtain what is hers by right, amplified their oppressive conduct in an effort to punish Shui and deprive her of income she relies upon not only to live but also to pay the tax obligations that TLG's success imposes upon her.

73.     Throughout the course of the handling of TLG's affairs, and especially since Shui exercised her right to withdrawal by buyout, Wang and Fan, in collaboration and concert with the KK Defendants, have acted in a vexatious manner and otherwise not in good faith.

**FIRST COUNT**
**Breach of Contract and Specific Performance of**
**Article XV of the Operating Agreement**
**(Wang and Fan)**

74.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

75.     Shui has properly exercised her right to a withdrawal-by-sale of her interest to the other members pursuant to Article XV of the Operating Agreement of TLG.

76.     Through company counsel, Wang and Fan accepted Shui's exercise of her right to a withdrawal-by-sale.

77.     Thereafter, while Shui engaged and commenced work with her own appraisers in furtherance of the process contained in the First Amendment to the Operating Agreement, Wang and Fan, through separate counsel, repudiated their acceptance and obligations to follow through.

78.     As a direct and proximate result of Wang's and Fan's breach of the Operating Agreement and denial of Shui's right to a withdrawal-by-sale after they had already acknowledged same, Shui has suffered and will continue to suffer significant financial harm.

## SECOND COUNT
## Oppression Pursuant to N.J.S.A. §42:2C-48
## (Wang and Fan)

79.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

80.     As a consequence of the aforementioned oppressive conduct of Wang and Fan in collaboration with and aided and abetted by the KK Defendants, it is not reasonably practicable to carry on TLG's activities in conformity with the Operating Agreement.

81.     Wang and Fan have acted and are acting in a manner that is illegal, including with respect to the handling of various human resources matters.

82.     Wang, Fan and the KK Defendants - particularly Wang, who holds unilateral authority over the business and wields it in her own interest to the derogation of the rights of Shui and even the best interests of TLG, itself - have acted and are acting in a manner that is oppressive and is and will be directly harmful to Shui.

83.     The most equitable resolution of these concerns would be enforcement of Article XV of the Operating Agreement and the process for administering the withdrawal-by-sale right set forth in the First Amendment to the Operating Agreement.  Dissolution, on the other hand, would be detrimental to TLG and all of the members, Shui included, because the business does not rely upon or own significant tangible or saleable assets beyond its operations as an ongoing concern.

## THIRD COUNT
## Direct Action on behalf of a Member to Enforce her Rights
## N.J.S.A. §42:2C-67
## (Wang, Fan and the KK Defendants)

84.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

85.     Shui has been denied access to information essential both to her ability to continue to serve in her role within TLG and to her ability to solicit third-party purchasers for her interest in TLG, which is her right pursuant to Article XV of the Operating Agreement.

86.     Shui has also been cut off from company counsel by Wang, Fan and the KK Defendants, who have deprived her of her right to know and understand the advice being given to TLG by the KK Defendants in their alleged capacity as company counsel.

87.     As a direct and proximate result of the other members' and the KK Defendants' denial of these rights belonging to Shui under the Operating Agreement, Shui has been and will continue to be harmed.

### FOURTH COUNT
### Breach of the Statutory Standards of Conduct for Members in an LLC
### N.J.S.A. §42:2C-39
### (Wang and Fan)

88.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

89.     Wang and Fan have, in connection with the conduct of TLG's business, engaged in intentional misconduct and knowing violations of law, including but not limited to with respect to certain human resources issues described hereinabove.

90.     Wang and Fan have failed to discharge their duties to TLG in a manner consistent with the contractual obligation of good faith and fair dealing.

91.     As a direct and proximate result of the foregoing breaches of Wang's and Fan's duties to Shui in their capacities as member-managers of TLG, Shui has been and will continue to be harmed.

## FIFTH COUNT
### Breach of Fiduciary Duty
### (Wang, Fan and the KK Defendants)

92.     Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

93.     As member-managers of TLG, Wang and Fan owe Shui a fiduciary duty, both pursuant to N.J.S.A. §42:2C-39 and at common law, to refrain from engaging in the management of TLG's business in a manner that involves intentional misconduct or knowing violations of the law.

94.     The conduct of Wang and Fan of the management of TLG, as is described hereinabove in detail, involved both intentional misconduct and knowing violations of law.

95.     Further, upon information and belief, Wang and Fan have taken, or are planning to take, steps to devalue or dissolve TLG solely in an effort to harm Shui.

96.     As purported company counsel to TLG, the KK Defendants owe Shui a fiduciary duty to refrain from playing favorites in a dispute among the members and to refrain from engaging in conduct designed to assist Wang and Fan in their efforts to oppress Shui and deprive her of her rights as a member in TLG.

97.     The conduct of the KK Defendants in their purported capacity as TLG counsel, as is described hereinabove in detail, constituted a breach of their fiduciary duties to Shui.

98.     As a direct and proximate consequence of Wang's, Fan's and the KK Defendants' breaches of their statutory and common-law fiduciary duties, Shui has been and will continue to be harmed.

## SIXTH COUNT
### Civil Conspiracy/Aiding and Abetting of the Oppression and Breach of Fiduciary Duty
### (Wang, Fan, the KK Defendants and John Does 1-10)

99.    Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

100.    The Defendants have conspired with one another to commit the foregoing wrongful and actionable conduct.

101.    Defendants acted in concert to commit the foregoing wrongful and actionable conduct.

102.    Defendants entered into an illicit agreement to inflict a wrong against Shui.

103.    Each Defendant understood the objectives of the scheme, accepted them and agreed, either implicitly or explicitly, to do his, her or its part to further them.

104.    Defendants engaged in the conduct described hereinabove in detail with actual malice or wanton and willful disregard of the rights of Shui, who stood to be foreseeably harmed.

105.    The KK Defendants and John Does (1-10) aided and abetted the oppressions and breaches of fiduciary duty on the part of Wang and Fan.

## SEVENTH COUNT
### Breach of the Covenant of Good Faith and Fair Dealing
### (Wang and Fan)

106.    Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

107.    As parties to the Operating Agreement, Wang and Fan owe Shui a duty of good faith and fair dealing.

108.    Wang's and Fan's efforts to frustrate Shui's ability to enjoy the benefits of her ownership in TLG, including but not limited to their efforts to frustrate Shui's contractually recognized right to seek third-party purchasers for her interest, constitute a breach of that duty.

109.    As a direct and proximate consequence of Wang's and Fan's breach of their covenant of good faith and fair dealing, Shui has been and will continue to be harmed.

**EIGHTH COUNT**
**Intentional Infliction of Emotional Distress**
**(Wang, Fan, the KK Defendants and John Does (1-10)**

110.    Shui incorporates herein by reference the allegations contained in the preceding paragraphs.

111.    Armed with knowledge of Shui's serious health concerns, Defendants have engaged in extreme and outrageous conduct, as described above.

112.    In addition, Wang and Fan have gone out of their way to make working together in TLG difficult and emotionally taxing on Shui.

113.    Wang, in particular, has been insulting, condescending and rude throughout the parties' dealings.

114.    Defendants' conduct in this regard has been intentional or, at the very least, reckless.

115.    The distress caused by Defendants has been so severe that it could be expected by any reasonable person to adversely affect Shui's mental health and to exacerbate her existing health issues.

116.    As a direct and proximate result of Defendants' intentional infliction of emotional distress upon her, Shui has suffered and will continue to suffer harm.

**WHEREFORE,** Shui demands judgment for the following relief:

25

a. Enforcing Shui's right to a withdrawal-by-sale pursuant to Article XV of the Operating Agreement of TLG;

b. In the alternative, ordering a buy-out of Shui's interest in TLG by Wang and Fan in furtherance of the Court's equitable powers under the New Jersey Limited Liability Act at a price determined in accordance with the First Amendment to the Operating Agreement;

c. Compelling Wang, Fan and the KK Defendants to restore Shui's access to the bank accounts, financial records and other business records of TLG, including all legal advice and related correspondence;

d. Awarding Shui compensatory damages against all Defendants, jointly and severally;

e. Awarding Shui punitive damages against all Defendants, jointly and severally;

f. Awarding Shui pre- and post-judgment interest against all Defendants, jointly and severally;

g. Awarding Shui her attorneys' fees against all Defendants, jointly and severally;

h. Awarding Shui her costs of suit against all Defendants, jointly and severally; and

i. For such further relief as this Court deems just.

Dated May 12, 2023

By: /s/ *Scott D. Baron*

Scott D. Baron, Esq.

## JURY DEMAND

Pursuant to R. 1:8-1(b) and R. 4:35-1(a), Plaintiff Jo Shui demands a trial by jury on all of the triable issues of this Complaint.

## DESIGNATION OF TRIAL COUNSEL PURSUANT TO R. 4:25-4

Scott D. Baron, Esq. is hereby designated as trial counsel pursuant to R. 4:25-4.

Dated May 12, 2023

By: /s/ *Scott D. Baron*

Scott D. Baron, Esq.

## CERTIFICATIONS

In accordance with R. 4:5-1, I hereby certify that the matter in controversy is not subject to any other action pending in any court or arbitration proceeding; there is no other action or arbitration proceeding contemplated; and that to the best of my knowledge, no other party should be joined in this action at the present time, except as discovery may reveal.

I further certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated May 12, 2023

By: /s/ *Scott D. Baron*

Scott D. Baron, Esq.